Richard J. Archer (CASBN 20720)
720 Petaluma Blvd. S, Apt. 6
Petaluma, California 94952
Tel: (707) 781-7165

David B. Golden (CASBN 114866)
Golden Kopcke
22 Battery Street, Suite 1000
San Francisco, California 94111
Tel: (415) 399-9994

Kristina Holman
1100 E Bridger
Las Vegas, Nevada 89101
Tel: (702) 614-4777
Local Counsel for Plaintiff

UNITED STATES DISTRICT COURT

for the

DISTRICT OF NEVADA

| | |
|---|---|
| SIGHTLINE PAYMENTS, LLC, a Nevada Company,<br><br>Plaintiff<br><br>v.<br><br>GLOBAL CASH ACCESS HOLDINGS, INC., a Corporation, and GLOBAL CASH ACCESS, INC., a Delaware Corporation,<br><br>Defendants. | Case No.<br><br>COMPLAINT OF SIGHTLINE PAYMENTS, LLC.<br><br>(Jury Demanded) |

Plaintiff complains of defendants and avers as follows:

### FACTS TO ALL CLAIMS

### PARTIES AND JURISDICTION AND VENUE

1. Jurisdiction and venue are proper because Defendants reside and are found in the district of Nevada. The activities of Defendants constituting antitrust violations as described herein and in paragraphs 2 through 7 are in commerce among the states of the

United States in that they involve the shipment of machines and kiosks from states outside Nevada into Nevada and the provision of cash, cash substitutes and credit in Nevada, all of which is in the flow of commerce among the several states of the United States.

2. Plaintiff SIGHTLINE PAYMENTS, LLC. is a Nevada Company entering the business of providing cash access products and related services to the gaming industry in the United States including the State of Nevada and the City of Las Vegas and environs.

3. Defendant GLOBAL CASH ACCESS HOLDINGS, INC. is a Delaware corporation listed on the New York Stock Exchange, which owns all the capital stock of Defendant GLOBAL CASH ACCESS, INC., a Delaware corporation (together said Defendants are referred to as "GCA"). GCA's principal place of business is Las Vegas, Nevada, and it is the leading provider in monopoly proportions of cash access products and related services to the gaming industry in the United States, Canada and the Caribbean. GCA's products and services provide gaming establishment patrons access to cash through a variety of methods. In addition, GCA provides products and services for credit decision making, cashier operations and patron marketing activities for gaming establishments.

4. GCA provides products and services to over 1,100 gaming establishments worldwide, and its clients include the ten largest gaming companies in the United States and Nevada. GCA provides its services to these gaming establishments pursuant to long-term contracts that generally give GCA the exclusive and monopolistic right to offer GCA's products in those establishments.

5 GCA's products enable gaming patrons to conduct ATM withdrawals, credit card cash advances, and point-of-sale debit card cash advances on more than 4,000 ATM or cash advance kiosks in gaming establishments worldwide and Nevada and Las Vegas and vicinity in particular. GCA also provides Western Union money transfers as well as check verification and check warranty service to gaming establishments that cash patron checks.

6. GCA owns Central Credit, the only gaming patron credit bureau, which provides detailed patron credit histories to gaming establishments. GCA's monopolistic position enables it to tie Central Credit services to GCA cash access services. GCA's

monopolistic position enables it to maintain data on millions of unique gaming patron transactions which can be used to enhance gaming establishments' patron-marketing activities. GCA, with its exclusive strategic partners including International Game Technology (IGT), has developed products that facilitate means of accessing funds in a cashless gaming environment, which products are being used by GCA in an attempt to monopolize cashless gaming. In 2008 alone GCA processed over 80 million transactions and put more than $21 billion into the hands of gaming patrons.

7. GCA has acquired a monopoly of providing cash access products, casino patron credit reporting, cashless gaming and redemption machines to gaming establishments in at least the markets in Las Vegas and environs and the State of Nevada.

## ACQUISITIONS

8. In April, 2008, GCA completed the acquisition of Certegy Gaming Services, Inc., an enterprise providing cash access products and services to the gaming industry in Las Vegas, Nevada and environs and elsewhere in the United States. In August, 2008, GCA completed the acquisition of Cash Systems, Inc, an enterprise which also provided cash access products and services to the gaming industry in the United States, including Nevada and Las Vegas and environs. Before the acquisition of Certegy Gaming Services, Inc. and Cash Systems, Inc., GCA controlled approximately 75% market share of cash access services equal to $17 billion provided to patrons using GCA cash access products and services in the gaming industry in Las Vegas and vicinity. After those acquisitions, GCA controlled another 15% of the market share amounting to an additional $4 billion. To summarize, GCA after completing the two acquisitions, now controls a 90% market share. In 2009, GCA provided $21 billion to gaming patrons through its cash access products and services.

9. As part of Sightline's entry into the market for providing cash access products and related services to the gaming industry in Las Vegas and vicinity, Sightline took steps to acquire Western Money Systems, a vendor of redemption kiosks to the gaming industry, evidenced by a letter of intent. GCA learned of the negotiations and with specific intent to deprive Sightline of the acquisition, and an attempt to extend its monopoly to the placement

of redemption kiosks in casinos, GCA offered to form a joint venture with Sightline to jointly acquire Western Money Systems; then GCA on its own made an all cash offer to Western Money Systems, which Sightline couldn't match. GCA thereby prevented Sightline from acquiring Western Money Systems and acquired Western Money Systems for itself and 2,000 redemption machines, 60% of which include ATM functions.

## RESTRICTIVE AGREEMENTS

10. In 1999, GCA acquired Central Credit LLC, which is the only specialty provider of credit information on gambling patrons to gaming establishments in the world. GCA ties the provision of gaming patron credit information to granting GCA exclusive rights to install cash access products in gaming establishments so as to further enhance its monopoly.

11. GCA makes long-term agreements with gaming establishments which give GCA exclusive rights to provide cash access products and related services to the gaming industry in Nevada and Las Vegas and vicinity. GCA has obtained the exclusive right to provide cash access products and related services to nearly 100% of the major casino organizations on the Las Vegas Strip and Atlantic City, New Jersey. GCA pays large sums of money to gaming establishments in subsidies and other incentives which only a monopoly could afford to do in order to obtain exclusive rights to provide cash access products and related services to the gaming industry in Nevada and Las Vegas and vicinity.

12. GCA makes long-term exclusive agreements with its vendors and providers. GCA's exclusivity agreements bar each of its vendors and providers from doing business with Sightline.

13. GCA makes all its sales and service personnel sign long-term covenants not to compete with GCA for 18 months to two years worldwide after termination of their employment so that competitors of GCA cannot hire those personnel who understand the business of providing cash access products and related services to the gaming industry and are able to sell and/or implement services in the industry.

## PATENT ABUSE

14. GCA purchased U.S. Patent No. 6,081,792 in 2005 to further restrict competition from offering certain services on ATM machines specific to the gaming industry. GCA commonly refers to this as 3-in-1 ATM technology. GCA has enabled nearly all their more than 3,000 ATM and/or redemption devices with the 3-in-1 technology.

15. More than one year prior to March 2003, GCA had publicly implemented ID Swipe Technology onto QCPWeb. Craig Potts, the founder of Cash Systems, applied for a patent on this same technology in March 2003, without disclosing the prior use, and a patent was issued on said technology in October 2006. Cash Systems, the owner of the patent until GCA acquired them in August 2008, was aware other companies, including GCA, were using ID swipe technology and never took action to enforce an obvious invalid patent. GCA, after acquiring the patent from Cash Systems, and with full knowledge that ID Swipe Technology had existed on QCPWeb since at least a year prior to the patent being filed has been telling casinos that if they use an alternative supplier to GCA that uses an ID Swipe Technology on the cage terminal, GCA will sue them for patent infringement and obtain court orders preventing them from processing transactions.

## DISPARAGEMENT

16. Arizona Department of Gaming (Department) recently entered into a Settlement Agreement and Release (Agreement) with Global Cash Access, Inc. (GCA) on November 17, 2009, for GCA's renewal of its gaming certification from the Department. Pursuant to the Terms and Conditions of that Agreement, GCA agreed not to associate or conduct business with Mr. Kirk Sanford, Sightline's President and Founder. In the Agreement, Mr. Sanford was referred to as one of "Excluded Persons". (See the Agreement, Terms and Conditions, Paragraph 3(b), Page 8). The term "Excluded Persons" as used in this Agreement refers to persons with whom GCA voluntarily agreed not to associate with or conduct business with. This "Excluded Persons" provision was not a condition required by the Department for the Settlement Agreement. GCA inserted this provision in an attempt to tarnish Mr. Sanford's reputation and character and to restrict Sightline's ability to seek the

necessary gaming certificates and/or licenses in the gaming industry to compete against GCA. GCA has sent this to gaming jurisdictions regulators and clients to which Sightline offers its services.

17. Kirk Sanford and certain other of Sightline's executives and founders, including Tom Sears, and Diran Kludjian, were all prior executives of GCA. Prior to Mr. Sanford founding Sightline and prior to the announcement of his retirement from GCA in 2007, he was the Chief Executive Officer, President, and Director of GCA. Under the leadership of Messrs. Sanford, Sears, and Kludjian, GCA went from a start-up company to NYSE public company with more than $1.5 billion market capitalization, $650 million in annualized revenues, and 400 employees around the world. Mr. Sanford was also the prior Chief Executive Officer, President and Owner of Central Credit.

18. Given the vast experience of Sightline's executive team and prior proven track record with GCA, it is reasonably probable that Sightline would have captured at least 50% of the current market if not prevented by GCA actions described in paragraphs 8 through 15 hereof.

## FIRST CLAIM FOR RELIEF
(Section 1 of Sherman Act)

19. Plaintiff incorporates in this paragraph all the foregoing paragraphs herein. Pursuant to Sections 15(a) and 26, U.S.C.A., Plaintiff bases this claim for damages and injunctive relief against Defendants for violation of Section 1 of the Sherman Act, 15 U.S.C.A., Section. 1.

20. The contracts and combinations made by Defendants and described in paragraphs 8 through 14 herein, each severally, violate 15. U.S.C.A. Section 1 in that each of said contracts and combinations unreasonably restrains trade; constitutes predatory, as well as exclusionary conduct and threatens competition in the industry.

21. The contracts and combinations have caused injury to Plaintiff in that Plaintiff has not been able to place as many cash access products in, and provide services to, gaming establishments as if the market were competitive and as if the gaming establishments were not tied up by Defendants' contracts and as if Defendants had not acquired Western Money

Systems.

22. Plaintiff is informed that Defendants threaten to continue their behavior as averred herein.

## SECOND CLAIM FOR RELIEF
### (Section 2 of the Sherman Act)

23. Plaintiff incorporates herein paragraphs 1 through 17 of this Complaint and bases this claim on Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C.A., Section 2.

24. The acquisitions, contracts and agreements described herein violate Section 2 of the Sherman Act in that they constitute a monopolization of trade or commerce among several states, and they have injured Plaintiff by denying Plaintiff access to gaming establishments for purpose of placing cash access products and related services.   25. Plaintiff is informed that Defendants' acts described herein in paragraphs 8 through 17 were done with specific intent to create a monopoly. Said acts constitute an attempt to monopolize prohibited by Section 2 of the Sherman Act.

## THIRD CLAIM FOR RELIEF

26. Plaintiff incorporates herein paragraphs 1 through 9 of this Complaint and bases this claim on Defendants' violation of the Section 7 of the Clayton Act, 15 U.S.C.A., Section 18.

27. The effect of each of the acquisitions averred herein may be substantially to lessen competition or tend to create a monopoly.

## PRAYER

WHEREFORE, Plaintiff prays that:

1. The actions of GCA be adjudged unlawful as alleged herein;

2. That the Plaintiff be awarded damages on the FIRST CLAIM FOR RELIEF in the amount of $100 million;

3. That the Plaintiff be awarded damages on the SECOND CLAIM FOR RELIEF in the amount of $100 million;

4. That the Plaintiff be awarded damages on the THIRD CLAIM FOR RELIEF in

the amount of $100 million;

5. That the Plaintiff be awarded treble damages as proved, its costs and attorneys' fee; and

6. For such other and further relief as the Court deems proper.

Dated: *March 22, 2010*  Signed: *Richard J. Archer*
RICHARD J. ARCHER
Attorney for Plaintiff

Dated: *3/22/2010*  Signed: *Kristina N. Holman*
KRISTINA HOLMAN
Local Counsel for Plaintiff